DECISION
Before the Court is the appeal of William V. Irons ("Irons"), seeking reversal of two orders issued by the Rhode Island Ethics Commission ("Ethics Commission" or "Commission"). In those orders, the Ethics Commission denied Irons' motion to dismiss a complaint against him and denied Irons a jury trial before the Commission. The Commission objects. Jurisdiction is pursuant to the Rhode Island Administrative Procedures Act ("RIAPA"), G.L. 1956 § 42-35-15.
 I Facts and Travel
This matter arises from a Complaint ("Ethics Complaint") filed with the Ethics Commission on January 20, 2004 by Robert P. Arruda ("Arruda") and Beverly M. Clay ("Clay"), residents of the State of Rhode Island. Arruda and Clay identified themselves as chair and vice chair, respectively, of Operation Clean Government ("OCG"). OCG describes itself as a statewide non-profit membership organization "dedicated to promoting honest, responsible, and responsive state government."About Operation Clean Government (OCG), *Page 2 
http://ocgri.org/about.html. In their Complaint, Arruda and Clay alleged that Irons violated conflict of interest prohibitions by engaging in debate and voting on legislation affecting pharmacies while having pecuniary relationships with CVS pharmacy, a pharmacy doing business in Rhode Island, and Blue Cross Blue Shield of Rhode Island, an insurer doing business in Rhode Island. (Ethics Compl. ¶¶ 5-8, 14-15, 19.) These acts allegedly occurred while Irons was an elected member of the Rhode Island Senate.
Pursuant to G.L. 1956 § 36-14-12(c), the Ethics Commission initiated an investigation based on the Ethics Complaint filed by Arruda and Clay. Soon thereafter the Commission held a probable cause hearing to determine whether, in its determination, sufficient evidence existed to proceed with its investigation. On November 15, 2004, the Commission issued an Order and Finding of Probable Cause in which it determined that probable cause existed that Irons violated two statutory provisions. (Order and Finding of Probable Cause [hereinafter Probable Cause Order] ¶¶ 1, 3.) The Commission's Probable Cause Order alleged that "by his participation in the Senate Corporations Committee's consideration of Pharmacy Freedom of Choice legislation in the 1999 and 2000 legislative sessions, the Respondent [Irons] participated in a matter in which he had a substantial conflict of interest, in violation of R.I. Gen. Laws § 36-14-5(a)." (Probable Cause Order ¶ 1.) The Probable Cause Order also stated:
 "There exists probable cause that, by his participation in the Senate Corporations Committee's consideration of Pharmacy Freedom of Choice legislation in the 1999 and 2000 legislative sessions, the Respondent [Irons] used his public office to obtain financial gain for CVS, his business associate, in violation of R.I. Gen. Laws § 36-14-5(d)." (Probable Cause Order ¶ 3.)
The Commission determined that probable cause did not exist that Irons violated three other statutory provisions. Id. at ¶¶ 2, 4-5. *Page 3 
The record indicates that no other papers were filed before the Ethics Commission until two and one-half years later. On April 13, 2007, Irons requested that the Ethics Commission provide him with a jury trial before the Commission. (Resp't Mem. of Law in Support of his Demand for Jury Trial [hereinafter Irons' Jury Trial Mem.] 1.) Irons premised his demand for a jury trial on article 1, sections 10 and 15 of the Rhode Island Constitution. (Irons' Jury Trial Mem. 1.)
In a Motion to Dismiss filed on November 6, 2007, Irons first raised the legal contention addressed in this Decision — namely, that the Commission's investigation violated the legislative immunity provided by the Speech in Debate Clause of the Rhode Island Constitution. (Resp't Mot. to Dismiss 1.) Ten days later the Ethics Commission's prosecutors submitted their objection to Irons' Motion to Dismiss. (Prosecution's Objection to Resp't Mot. to Dismiss 1.) After hearing arguments from Commission prosecutors and Irons' attorney, the Commission denied Irons' Motion to Dismiss and his request for a jury trial. (Ethics Commission Hr'g Tr. 14, 16.)
On December 13, 2007, Irons timely filed a Complaint in the Superior Court ("Complaint").[1] In this Complaint, Irons contends that the Commission improperly denied his Motion to Dismiss and Demand for Jury Trial. (Compl. ¶ 4.) Irons posits that "[a]ny prosecution or trial of the remaining two counts against Irons in the Probable Cause Finding violates Irons' privileges, rights and immunities under the Speech in Debate Clause, as the two counts asserted against him directly depend upon proof that he participated in the Senate *Page 4 
Corporation Committee's consideration of legislation in the 1999 and 2000 legislative sessions." Id. at ¶ 21. Irons also asserts that he has a "fundamental right to a trial by jury. . . ." Id. at 23.
The Ethics Commission objects. It argues that "the Ethics Amendment [of the Rhode Island Constitution] clearly and necessarily carved out a narrow exception to a legislative immunity to authorize the Rhode Island Ethics Commission's investigation into and enforcement concerning legislative violations of the Code of Ethics." (Rhode Island Ethics Commission's Mem. of Law in Supp. of its Objection to William V. Irons' Appeal [hereinafter Commission's Mem. of Law in Supp. of its Objection] 5.) The Commission also stated that "[t]he protections afforded accused persons in criminal proceedings pursuant to Article 1, section 10 [of the Rhode Island Constitution] do not attach before the Ethics Commission in administrative agency proceedings to adjudicate civil statutory violations of the Code of Ethics" and "Irons is not entitled to a jury trial pursuant to Article 1, section 15 given that the Ethics Commission proceedings involve the adjudication of public rights on behalf of the People of the State of Rhode Island." (Commission's Mem. of Law in Supp. of its Objection 29.)
The Court heard extensive oral arguments on July 30, 2008 and now proceeds to decide this matter.
 II Standard of Review
Allegations of violations of the Code of Ethics are reviewed pursuant to the RIAPA. Section 36-14-15. As the parties indicated during oral arguments before the Court, this matter presents questions of law. The RIAPA requires that the Court review questions of law de novo. In reAdvisory Opinion to the Governor, 732 A.2d 55, 60 (R.I. 1999);see Arnold v. R.I. Dep't of Labor Training Bd. of Review,822 A.2d 164, 167 (R.I. 2003) (citing Johnston Ambulatory Surgical Assocs. v.Nolan, 755 A.2d 799, 805 (R.I. 2000)). The Court may reverse, modify, or *Page 5 
remand any of the Ethics Commission's orders if that order substantially prejudiced Irons by being
 "(1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Section 42-35-15(g); see Barrington Sch. Comm. v. Rhode Island State Labor Relations Bd., 608 A.2d 1126, 1138 (R.I. 1992).
It is the Court's duty "to determine what the law is and its applicability to the facts." Chenot v. Bordeleau, 561 A.2d 891, 893
(R.I. 1989) (citing Carmody v. Rhode Island Conflict of InterestComm'n, 509 A.2d 453, 458 (R.I. 1986)).
 III Law and Analysis A Ethics Amendment
The Ethics Commission is a constitutionally mandated administrative body. R.I. Const., art. 3, sec. 8. The Commission derived from the 1986 ratification of article 3, section 8 of our state's Constitution.In re Advisory Opinion to the Governor (Ethics Commission), 612 A.2d 1,3 (R.I. 1992). This amendment requires that the General Assembly "establish an independent non-partisan ethics commission which shall adopt a code of ethics including, but not limited to, provisions on conflicts of interest, confidential information, use of position, contracts with government agencies and financial disclosure." R.I. Const., art. 3, sec. 8. Section 8 makes clear that "[a]ll elected and appointed officials . . . of state and local governments" are bound by the *Page 6 
Code of Ethics. Moreover, the amendment obligates the Ethics Commission to investigate violations of the Code of Ethics and impose appropriate penalties. Id.
Accordingly, the Legislature enacted §§ 36-14-1 to 21, entitled the Rhode Island Code of Ethics. Among the many duties and procedures specified by the Legislature is the range of penalties which the Commission is statutorily authorized to impose if it finds that a particular elected or appointed official has violated any provision of the Code of Ethics. Sections 36-14-13(d), 36-14-19. The Commission may order the individual to cease and desist the violative activity, require that the individual file a report or statement, impose a civil penalty of not more than $25,000 for each violation, refer the matter to the Attorney General, or remove the individual from office. Section 36-14-13(d). In addition, § 36-14-19 states that "[a]ny person who knowingly and willfully violates the provisions of [the Code of Ethics] shall, in addition to the civil penalties provided herein, be guilty of a misdemeanor punishable by a fine of not more than one thousand dollars ($1,000) and/or imprisonment for no longer than one year."
Along with article 3, section 8, the People of the State of Rhode Island also enacted in 1986 article 3, section 7 of our state's Constitution. In re Advisory Opinion, 612 A.2d at 3. Section 7 explicitly states that our state's "public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust . . . avoid the appearance of impropriety and not use their position for private gain or advantage."
Considered as a unit, "[t]he primary intent of article 3, sections 7 and 8, is to vest in the [E]thics [C]ommission the `authority to develop a code of ethics, to investigate violations, and to enforce its provisions, always subject to review by the judicial branch of government consistent with the Constitution.'"[2] In re AdvisoryOpinion, 732 A.2d at 60. These recently enacted *Page 7 
constitutional amendments, the Commission argues, authorize it to investigate alleged violations of the Ethics Code by Irons and to penalize him in accordance with § 36-14-13(d) and § 36-14-19. (Commission's Mem. of Law in Supp. of its Objection 5.) Irons, however, contends that the Speech in Debate Clause of the Rhode Island Constitution prohibits his questioning or prosecution for any alleged offense which is based on his duties as a legislator. (Pl. William V. Irons' Mem. of Law in Supp. of his Appeal [hereinafter Irons' Mem. of Law] at 11.)
 B Speech in Debate Clause
The Speech in Debate Clause is contained in the final sentence of article 6, section 5 of the Rhode Island Constitution: "For any speech in debate in either house, no member shall be questioned in any other place."[3] The origins of the legislative immunity provided by the Speech in Debate Clause can be traced to seventeenth century England. "The language in both the federal and state speech in debate clause appears to be taken directly from the English Bill of Rights of 1689."Holmes v. Farmer, 475 A.2d 976, 981 (R.I. 1984). According to theHolmes Court, the purpose of the English Bill of Rights was "to ensure `that the freedom of speech and debates or proceedings in Parliament ought not to be impeached or questioned in any court or place out of Parliament.'" Id. (quoting Robert J. Reinstein Harvey A. Silverglate,Legislative Privilege and the Separation of Powers, 86 Harv. L.Rev. 1113, 1129-30 (1973)). More specifically, "[t]he purpose of the speech in debate clause is to ensure the Legislature freedom in *Page 8 
carrying out its duties. . . . This freedom ensures the separation of powers among the coordinate branches of government." Holmes,475 A.2d at 982. The privilege provided by the Speech in Debate Clause was thought so essential to the assurance of representative government that it was incorporated into the Articles of Confederation and later into the constitutions of several states and the federal government.[4]Id. The first judicial interpretation of the Speech or Debate privilege in the United States can be traced back to 1808. In Coffin v.Coffin, 4 Mass. 1, 27 (1808), the Massachusetts Supreme Judicial Court described the importance of the privilege to the proper working of a representative democracy:
 "These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office, without fear of prosecutions, civil or criminal, I therefore think that the article ought not to be construed strictly, but liberally, that the full design of it may be answered." Coffin v. Coffin, 4 Mass. 1, 27 (1808) (quoted in Holmes, 475 A.2d at 982).
In spite of the long history of privileging the actions and words of legislators, neither the Speech in Debate Clause nor its federal counterpart provides public officials with absolute immunity. In a landmark decision, the United States Supreme Court explained that its interpretation of the federal Speech or Debate Clause
 "does not touch a prosecution which, though as here founded on a criminal statute of general application, does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them. And, without intimating any view thereon, we expressly leave open for consideration when the case arises a prosecution which, though possibly entailing inquiry into legislative acts or motivations, is founded upon a narrowly drawn statute passed by Congress in the exercise of its legislative power *Page 9 
to regulate the conduct of its members." United States v. Johnson, 383 U.S. 169, 185
(1966).
Six years later, the Supreme Court clarified that "Johnson thus stands as a unanimous holding that a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts." U.S. v.Brewster, 408 U.S. 501, 512 (1972) (referencing Johnson,383 U.S. at 185).
Rhode Island follows the guidance issued by the Johnson andBrewster Courts that legislators may, in particular circumstances, be questioned or prosecuted outside the legislative chambers. InHolmes, the first case to interpret Rhode Island's Speech in Debate Clause, our Supreme Court explained the limits of the legislative immunity:
 "Legislators should not be questioned by any other branch of government for their acts in carrying out their legislative duties relating to the legislative process. We go no further at this time than to hold that the speech in debate clause limits judicial inquiry into words or actions that are clearly a part of the legislative process. The scope of the privilege does not extend to actions by legislators outside the legislative process." 475 A.2d at 983
(emphasis added).
More recently, our Supreme Court held that legislators and legislative employees "are entitled to absolute legislative immunity from suit for actions that fall within the parameters of their positions." Marra v.O'Leary, 652 A.2d 974, 975 (R.I. 1995) (emphasis added). The Court's duty, therefore, is to determine whether the allegations made against Irons "fall within the parameters of [his] position" and are thus "a part of the legislative process" that are beyond the reach of any other branch of government. Marra, 652 A.2d at 975; Holmes, 475 A.2d at 983. In determining whether particular conduct is legislative, however, the "court must consider the nature of the acts in question, rather than the motive or intent of the official performing them." Maynard v. Beck,741 A.2d 866, 870 (R.I. 1999) (citing Bogan v. Scott Harris, 523 U.S. 44, 54 *Page 10 
(1998)). This is true even if the legislators are "attempting to advance their own personal and political interests. . . ." Id. In other words, "as long as defendants' challenged actions, stripped of all considerations of intent and motive, were legislative in character, the doctrine of absolute legislative immunity protects them from such claims." Id.
In Brewster, the United States Supreme Court defined a "legislative act" for which the federal Speech or Debate Clause grants immunity as "an act generally done in Congress in relation to the business before it. In sum, the Speech or Debate Clause prohibits inquiry only into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts."408 U.S. at 512. The Rhode Island Supreme Court's explanation that "[l]egislators should not be questioned . . . for their acts in carrying out their legislative duties relating to the legislative process" is consistent with Brewster. Holmes, 475 A.2d at 983; seeBrewster, 408 U.S. at 975. In Marra, the Court described "discussi[on] and voting on proposed legislation" by members and employees of the General Assembly's Joint Committee on Accounts and Claims as "precisely the type of activity that legislative immunity was intended to protect."652 A.2d at 975 (citing Holmes, 475 A.2d at 984). Similarly, theHolmes Court determined that "[i]nquiry by the court into the actions or motivations of the legislators in proposing, passing, or voting upon a particular piece of legislation . . . falls clearly within the most basic elements of legislative privilege." 475 A.2d at 984.
In contrast, activities outside the core legislative functions are not granted legislative immunity. The United States Supreme Court determined that criminal acts, even if performed to facilitate a legislative function, are not privileged under the Speech or Debate Clause.Gravel v. United States, 408 U.S. 606, 621 (1972). In discussing a hypothetical situation based on the facts of the case before it, the Court stated that, *Page 11 
 "no prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, in order to secure information for a hearing, themselves seized the property or invaded the privacy of a citizen. Neither they nor their aides should be immune from liability or questioning in such circumstances." Id.
Likewise, the Brewster Court held that political activities performed by legislators, even if entirely legitimate, are not protected by the Speech or Debate Clause. 408 U.S. at 512. The Court explained the distinction between legislative and political activities in the following terms:
 "It is well known, of course, that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate `errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called `news letters' to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative. . . ." Id.
Importantly, the Court also noted an activity of a decidedly illegitimate nature that is not privileged by the Speech or Debate Clause — bribery. Id. at 526. According to the Court, the defendant United States Senator could be criminally prosecuted for "taking or agreeing to take money for a promise to act in a certain way."Id. The Court distinguished between the illegal act of taking or agreeing to take money in exchange for a particular action and the actual performance of that promised action in the Senate. Id. Though a legislator's actual performance on the legislature's floor or in a committee room was privileged by the Speech or Debate Clause, the legislator's taking or agreeing to take money in exchange for that performance was not privileged. Id. Similarly, in United States v.Helstoski, 442 U.S. 477, 489 (1979), the Court reaffirmed its determination in Brewster that "[p]romises by a Member [of Congress] to perform *Page 12 
an act in the future are not legislative acts," and, therefore, are not privileged by the Speech or Debate Clause. In the words of one commentator, "[t]he Supreme Court's distinction between privileged legislative activity and unprivileged illicit promises to perform a certain legislative act therefore remains a workable one." Steven F. Huefner, The Neglected Value of the Legislative Privilege in StateLegislatures, 45 Wm. Mary L.Rev. 221, 302 (2003).
 C Constitutional Construction
In construing any constitutional provision, including the Ethics Amendment and the Speech in Debate Clause, this Court
 "rel[ies] on the well-established rule of constitutional construction that when words in a constitution are free from ambiguity, they are to be given their plain, ordinary, and usually accepted meaning. Moreover, every clause must be given its due force, meaning and effect and that no word or section must be assumed to have been unnecessarily used or needlessly added. [This Court] must presume the language was carefully weighed and that its terms imply a definite meaning." In re Advisory Opinion, 612 A.2d at 7
(internal quotations and citations omitted).
The Court finds that the text of both the Ethics Amendment and the Speech in Debate Clause are free of ambiguity. Indeed, neither party in this case contends otherwise. Consequently, the Court must give each of these constitutional provisions its plain, ordinary and usually accepted meaning. Id.; McKenna v. Williams, 874 A.2d 217, 232 (R.I. 2005) ("Constitutions, just like statutes, have an effect by what theysay. When a constitutional provision is clear, it speaks for itself");Bandoni v. State, 715 A.2d 580, 590 (R.I. 1998) (A court must assume that the framers carefully weighed and considered the words in each clause of the State Constitution and intended those terms to imply a definite meaning); Davis v. Hawksley, 379 A.2d 922, 923 (R.I. 1977) ("Unless a contrary intent clearly appears on the face of a constitutional provision, absent *Page 13 
equivocal or ambiguous language, the words cannot be interpreted or extended but must be applied literally.").
The central question of constitutional construction concerns the Ethics Commission's contention that the Ethics Amendment conflicts with the Speech in Debate Clause. (Commission's Mem. of Law in Supp. of its Objection 27-28.) Specifically, the Commission contends that the provision of the Ethics Amendment granting the Commission the authority to investigate allegations of the Code of Ethics by elected and appointed officials conflicts with the Speech in Debate Clause's grant of immunity to legislators. The Commission proceeds to urge the Court that the more recent enactment of the Ethics Amendment as compared to the Speech in Debate Clause requires the Court to give effect to the Ethics Amendment rather than the Speech in Debate Clause. Id. at 28.
Justice Suttell, writing separately from the majority in McKenna v.Williams, a case requiring the Court's interpretation of allegedly conflicting constitutional amendments, explained the analysis that this Court follows in construing the two relevant constitutional provisions: "`[C]ourts should attempt to construe two statutes that are in apparent conflict so that, if at all reasonably possible, both . . . may stand and be operative.'" 874 A.2d 217, 242 (R.I. 2005) (quoting ShelterHarbor Fire Dist. v. Vacca, 835 A.2d 446, 449 (R.I. 2003)) (Suttell, J., concurring in part and dissenting in part) (alteration in original).[5] "Only when the two statutory provisions areirreconcilably repugnant will a repeal be implied and the last-enacted statute be preferred." McKenna, 874 A.2d at 241 (quoting Berthiaume v.Sch. Comm., 121 R.I. 243, 248- *Page 14 
49, 397 A.2d 889, 893 (1979)).[6] "[R]epeals by implication are not favored by the law. When the repealing effect of a statute is doubtful, the statute will be strictly construed to effectuate itsconsistent operation with previous legislation. Id. at 241 (quotingSutherland Stat. Const. § 23:10 (6th Ed.)). The reason for the law's disfavoring of implied repeals is clear:
 "The presumption against implied repeals is founded upon the doctrine that the legislature is presumed to envision the whole body of the law when it enacts new legislation. Therefore, the drafters should expressly designate the offending provisions rather than leave the repeal to arise by implication from the later enactment. Where a newly enacted statute is silent on a previous existing one, the indication is that the legislature did not intend to repeal the existing one." Sutherland Stat. Const. § 23:10 (6th Ed.) (emphasis added).
In this case, the Court must presume that the drafters of the 1986 Amendments to the Constitution were aware of the long-standing immunity granted to legislators by the Speech in Debate Clause when they drafted the expansive new amendment which created the Ethics Commission. Indeed, the Speech in Debate Clause was obviously reviewed by the Convention delegates because — without revising the language in any way — they renumbered the clause from article 4, section 5 to article 6, section 5. The Ethics Amendment, however, makes no reference to, and is silent regarding its effect upon, the Speech in Debate Clause.[7] In the absence of language that either abrogates or limits the traditional protections provided by the Speech in Debate Clause, any effect upon the earlier amendment can only be by implication. Moreover, to construe the scope of the Ethics Amendment to permit inquiry into core areas of protected *Page 15 
legislative activity, as the Commission suggests, would result in the partial repeal by implication of the Speech in Debate Clause.
 D Harmonizing the Ethics Amendment with the Speech in Debate Clause
After reviewing the breadth of the Ethics Amendment and the Speech in Debate Clause, the Court concludes that while these separate constitutional provisions offer obviously divergent interests and protections, they are not irreconcilably repugnant. Rather, these two provisions can absolutely be read to coexist so that both may stand and be operative. The Speech in Debate Clause provides legislators with express immunity for acts that fall within the parameters of their legislative positions. See Marra, 652 A.2d at 975. Independently, the Ethics Amendment authorizes the Ethics Commission to investigate and enforce alleged violations of the Code of Ethics by "[a]ll elected and appointed officials and employees of state and local government." R.I. Const., art. 3, sec. 8; In re Advisory Opinion, 732 A.2d at 60. The Speech in Debate Clause has no effect upon the Ethics Commission's ability to enforce the Code of Ethics against persons not engaging in protected legislative activity, e.g., proposing, passing, or voting on legislation. See Holmes, 475 A.2d at 983-984.
Furthermore, "[a] robust legislative privilege need not and should not preclude vigorous enforcement of criminal laws focused on potential abuses of legislative and government power." Huefner, The NeglectedValue of the Legislative Privilege, 45 Wm. Mary L.Rev. at 301. The demarcation repeatedly expressed by the high courts of the United States and Rhode Island between privileged activities essential to the legislative process and unprivileged activities unnecessary — even if helpful or commonplace — to the legislative process is instructive. While legislators may be questioned, including by the Ethics Commission, for unprivileged activities, *Page 16 
they may not be questioned by the executive or judicial branches of government for the privileged activities essential to the functioning of the legislative branch. Maynard, 741 A.2d at 871; Marra,652 A.2d at 975; Holmes, 475 A.2d at 984 ("Inquiry by the court into the actions or motivations of the legislators in proposing, passing, or voting upon a particular piece of legislation . . . falls clearly within the most basic elements of legislative privilege.").
Here, both the Complaint filed by Arruda and Clay, which initiated the Ethics Commission's investigation of Irons, and the Commission's probable cause Order are explicitly premised on Irons' legislative activities. According to the Complaint filed by Arruda and Clay, "By acting in his governmental capacity, as Chairman of the Corporations Committee, Respondent [Irons], as Chairman of said Committee, actively opposed and voted against `freedom of choice' bills. . . . In so doing, Respondent deliberated, considered, or otherwise participated in a governmental decision to affect pharmacy issues. . . ." (Ethics Compl. ¶ 14.) Likewise, the Commission's Order states that "[t]here exists probable cause that, by his participation in the Senate Corporations committee's consideration of Pharmacy Freedom of Choice legislation in 1999 and 2000" Irons violated various statutory provisions. (Probable Cause Order ¶¶ 1, 3.) Discussion of and voting on legislation is unquestionably within the legislative immunity granted by the Speech in Debate Clause. Marra, 652 A.2d at 975; Holmes, 475 A.2d at 984.
This Court agrees with the Helstoski Court's recognition that "without doubt the exclusion of such evidence [of alleged impropriety because of the Speech or Debate Clause] will make prosecutions more difficult."442 U.S. at 488. However, this Court is obligated to enforce the will of the people as expressed through the Constitution and not to ensure the ease of the work of any prosecutorial agency. So long as the Speech in Debate Clause remains a part of the Rhode Island Constitution, *Page 17 [8] the Court has an obligation to uphold it. Constitutional provisions — no matter how old — cannot be disregarded. The Commission has called the Speech in Debate Clause "obscure" and "archaically written in 17th century English dialect" as if the rights embodied in constitutional provisions fade with age. (Commission's Mem. of Law in Supp. of its Objection 27; Tr. 20.) The Speech in Debate Clause has been a part of our state constitution since it was adopted in 1843, and it has been interpreted, defined, and discussed multiple times by our Supreme Court. In all cases, our Supreme Court has recognized the legislative privilege it contains. It is far from obscure. While this Court is certainly mindful of the tension that exists between a legislative privilege and the need for open government, it is required to respect the Constitution as written. The words of George Washington in his 1796 farewell address are as applicable now as they were when he said:
"The basis of our political systems is the right of the people to make and to alter their Constitutions of government. But the Constitution which at any time exists, `till changed by an explicit and authentic actof the whole people, is sacredly obligatory upon all. The very idea of the power and the right of the People to establish Government presupposes the duty to every Individual to obey established Government." George Washington, Farewell Address (Sept. 19, 1796),in George Washington: A Collection 518, (W.B. Allen ed., 1988) (emphasis added).
 The framers of our own State Constitution no doubt also recognized the importance of Washington's words because they incorporated these words directly into art. 1, sec. 1 of the Rhode Island Constitution. Likewise, if the drafters of the Ethics Amendment intended to suspend, or otherwise repeal, or in any way dilute the Speech in Debate Clause in Ethics Commissions proceedings, they could have and should have made that intention explicit as is *Page 18 
required by the rules of statutory construction. In the words of Justice Benjamin Cardozo, a court cannot "pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take the statute as we find it."Anderson v. Wilson, 289 U.S. 20, 27 (1933). The same is true of constitutional provisions. The Ethics Commission, under the constitutional mandate bestowed by the people of this state, is free to investigate alleged violations of the Code of Ethics by Irons so long as the investigation is not premised on actual legislative actions or the motive or intent in performing them. Maynard, 741 A.2d at 870. The Commission must, however, operate without infringing on the equally mandated constitutional privilege afforded for generations by the people of this state to legislators, including Irons, through the Speech in Debate Clause.
Lastly, the Ethics Commission has argued that for over twenty years, "no legislator has challenged [its] constitutional authority to enforce the Code of Ethics' conflict of interest and use of position provisions against legislators." (Commission's Mem. of Law in Supp. of its Objection 18.) Indeed, there have been several notable cases in this state in which legislators have submitted to the Ethics Commission's authority and paid substantial fines.
Judicial history is filled with examples of cases in which one of the parties was the first to invoke a right inherent in a constitution. During oral arguments, the Court was reminded of Gideon v.Wainwright, 372 U.S. 335 (1963), the landmark case in which the United States Supreme Court held that state courts are required under theSixth Amendment to provide counsel in criminal cases for defendants unable to afford their own attorneys. Mr. Gideon was the first to successfully argue for that constitutional protection. Just because others did not previously succeed or insist upon the right is inconsequential. Similarly, in Brown v. Board of Education, 347 U.S. 483 (1954), the landmark Supreme Court decision that impacted the area of education *Page 19 
and racial desegregation, the Court concluded "that in the field of public education the doctrine of `separate but equal' has no place. Separate educational facilities are inherently unequal." Prior to theBrown decision, it had been assumed by prior court decision that de jure racial segregation in schools did not violate the Equal Protection Clause of the 14th Amendment.
Here, Irons is not asking the Court to find legislative immunity in the penumbras or emanations of a vaguely worded constitutional provision. The Speech in Debate Clause is a plainly worded provision that has been a part of the Rhode Island Constitution since its founding. The Ethics Commission itself does not dispute the history or the legal impact of the provision. (Commission's Mem. of Law in Supp. of its Objection at 21.) Indeed, the Commission concedes that but for the Ethics Amendment, Irons would enjoy legislative immunity under the Speech in Debate Clause. Id. The Ethics Commission's central argument is that because the Ethics Amendment provides in general language that the Code of Ethics shall apply to "all elected officials" that this creates an exception to the Speech in Debate Clause. This argument asks too much of the Court and is not founded upon existing law or precedent. Absent an irreconcilable conflict between the two constitutional provisions — meaning one is eviscerated by the other — which is not the case here, the Court must recognize and give effect to both. McKenna,874 A.2d at 241; Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry,476 F.3d 326, 330 (5th Cir. 2007). The Ethics Amendment is simply not eviscerated by the Speech in Debate Clause. Many of the Ethics Commission's investigations, complaints or decisions issued over the years have not involved legislative acts. See
www.ethics.ri.gov/Complaints/Decisions. As for the Ethics Commission's jurisdiction over legislators, while the Speech in Debate Clause undeniably makes prosecutions impossible when legislators are acting in a legislative capacity, it is no bar to investigating improper political activity, bribery, general dishonesty, or any violation that is not *Page 20 
based upon that legislative activity. Unless and until our State Constitution is amended, the Ethics Commission, just as the Attorney General, has the right to prosecute public offenses consistent with the provisions of the Ethics Amendment, but it also must award legislators involved in the legislative process the full protection of the Speech in Debate Clause as interpreted and defined by our Supreme Court.
 E Right to Jury Trial
Though the Court's determination that the Ethics Commission is prohibited by the Speech in Debate Clause from prosecuting the allegations brought against Irons, the Court, to complete the record, will proceed to decide the issue regarding Irons' claim that he is entitled to a trial by jury. Article 1, section 10 of the Rhode Island Constitution guarantees that "[i]n all criminal prosecutions, accused persons shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." Another provision, article 1, section 15, states in part: "The right of trial by jury shall remain inviolate." The Court will discuss each section in turn.
 1 Article 1, Section 10
The Court first addresses Irons' contention that the Ethics Commission's complaint falls within the reach of article 1, section 10. This provision explicitly states that the scope of its protection is limited to "all criminal prosecutions." R.I. Const., art. 1, sec. 10;see Ajootian v. Hous. Bd. of Review, 98 R.I. 370, 375, 201 A.2d 905, 908
(1964) (stating that the petitioner's reliance on article 1, section 10 in an appeal of a decision of an administrative agency "is clearly inappropriate for we have repeatedly held that clause to be applicable only in criminal prosecutions"). *Page 21 
Ethics Commission proceedings, however, are civil in nature. The mere possibility of penal sanctions does not render the Commission's proceedings criminal. Ajootian, 98 R.I. at 375, 201 A.2d at 908 (stating that article 1, section 10 is inapplicable "even in circumstances where, as in this case, its assistance is invoked in civil proceedings under an enactment which also contains penal sanctions") (citing Kane v.Lapre, 69 R.I. 334, 33 A.2d 218, 221 (1943)). Indeed, the Legislature explicitly requires that Commission proceedings operate in a manner analogous to civil proceedings. See § 42-35-10 (requiring that the Rules of Evidence "as applied in civil cases in the superior courts" apply to administrative proceedings such as those conducted by the Ethics Commission). In addition, the RIAPA clearly states that review of agency decisions by a Justice of the Superior Court is to be conducted "without a jury." Section 42-35-15. Moreover, the Legislature has authorized the Ethics Commission to impose a "civil penalty" upon finding that the Ethics Code was violated. Section 36-14-13(d); see Hudson v. U.S.,522 U.S. 93, 104 (1997) (stating that monetary penalties are a traditional form of civil remedy and not historically viewed as punishment). Consequently, Irons' argument contending that the Ethics Commission's complaint falls within the reach of article I, section 10 is without merit.
 2 Article 1, Section 15
The Court now proceeds to consider Irons' contention that he is entitled to a jury trial before the Commission under article 1, section 15. Specifically, Irons argues that he has a right to a jury trial underFUD's, Inc. v. State of Rhode Island, 727 A.2d 692 (R.I. 1999) because "prohibitions against conflicts of interest or other misconduct by public officials were charges that existed at common law prior to the adoption of the Rhode Island Constitution." (Irons' Mem. of Law 16, 20.) The Ethics Commission counters that the "right to jury trial is *Page 22 
inapplicable to Ethics Commission proceedings which involve the adjudication of public rights" and that this case clearly falls under the public rights doctrine adopted in National Velour Corp. v.Durfee, 637 A.2d 375 (R.I. 1994). (Commission's Mem. of Law 33, 38.)
More than one hundred twenty-five years ago, the Rhode Island Supreme Court explained that the right to trial by jury "was so dear to our ancestors, on both sides of the Atlantic . . . [that] they so often and so strenuously protested" against its denial. Mathews v. Tripp,12 R.I. 256, 258 (1879). Two decades later, the Supreme Court explained that "[t]he right of trial by jury, secured by the constitution, is simply the right to that kind of trial in all such cases as were triable by jury at the time of the adoption of the constitution, without any restrictions or conditions which materially hamper or burden the right."Mathewson v. Ham, 21 R.I. 311, 314, 43 A. 848, 849 (1899),overruled on other grounds by State v. Holliday, 109 R.I. 93, 104,280 A.2d 333, 339 n. 2 (1971).
This right has remained intact to the present day. In 1999, the Rhode Island Supreme Court reiterated that the right of trial by jury expressed in article 1, section 15 "must remain available to litigants in any type of legal action which was triable before a jury in 1843, the year when Rhode Island's first constitution became effective."FUD's, Inc. v. State of Rhode Island, 727 A.2d at 695 (citingEgidio DiPardo Sons, Inc. v. Lauzon, 708 A.2d 165, 171 (R.I. 1998);Bendick v. Cambio, 558 A.2d 941, 943-44 (R.I. 1989)) (internal citation omitted). The FUD's Court proceeded to explain that "[i]n attempting to determine whether a cause of action triggers the right to a jury trial, we generally ask whether the particular cause of action or any analogous claim would have been triable to a jury in 1843." FUD's,727 A.2d at 695. The Court also analyzes whether the type of relief available for the cause of action is legal or equitable. Id. "Indeed, this available-relief analysis is "`[m]ore important' than finding a precisely analogous *Page 23 
common law cause of action in determining whether" article 1, section 15, mandates the opportunity for a jury trial." Id. (quoting Tull v.U.S., 481 U.S. 412, 421 (1987)).
The Rhode Island Supreme Court has carved out an exception, however, and no jury trial is required under article 1, section 15 when a cause of action exclusively involves the adjudication of public rights.Id. at 698; National Velour, 637 A.2d at 379-381; see Robert B. Kent et al., Rhode Island Civil and Appellate Practice, § 38.2. In NationalVelour, wherein the Court addressed a party's right to a jury trial in certain environmental enforcement proceedings, our Supreme Court adopted the public rights doctrine developed over many years by the United States Supreme Court: "We are persuaded by the public-rights doctrine developed by the United States Supreme Court and adopt it to analyze our jury-trial right in instances wherein the Legislature has assigned adjudication of civil penalties to an administrative agency."Id. at 379. "Public rights" cases, as characterized by the United States Supreme Court, are those "in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact." Id. at 379 (quoting Altas Roofing Co. v.Occupational Safety and Health Review Commission, 430 U.S. 442, 450
(1977)). The United States Supreme Court further noted that public rights are newly created "statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency or specialized court of equity." Id. (quotingGranfinanciera, S.A. v. Nordberg, 492 U.S. 33, 55 n. 10 (1989)). While no right to a jury trial exists in actions exclusively involving public rights, in a hybrid cause of action, "one involving not only the adjudication of public rights, but also of a private party's right to obtain compensatory and/or punitive damages from another private party for a statutory violation," the right to obtain a jury trial remains inviolable. FUD's, 727 A.2d at 698. The distinction between "public rights" enforceable by the government and *Page 24 
"private rights" enforceable by individuals is therefore important when determining a party's right to a jury trial.[9] National Velour,637 A.2d at 378-379.
This Court agrees with the Ethics Commission that its proceedings against Irons fall squarely within the public rights doctrine as articulated in National Velour. As in National Velour, this case clearly presents a situation in which the state is a party to an action to enforce a statutory right that is part of a newly created regulatory scheme. The Legislature has assigned the adjudication of the Code of Ethics, a civil statutory and regulatory scheme, to the Ethics Commission. See § 36-14-13. Furthermore, in the declaration of policy contained in the Code of Ethics, the Legislature stated that
 "It is the policy of the state of Rhode Island that public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable, responsive, avoid the appearance of impropriety, and not use their position for private gain or advantage." Section 36-14-1.
A policy of ensuring that public officials and employees adhere to the "highest standards of ethical conduct" is for the benefit of all the people of the State of Rhode Island. It is well-recognized that "[e]very public office is created in the interest and for the benefit of the people, and belongs to them; thus, a public office is a public agency or trust created in the interest and for the benefit of the people." 63C Am. Jur. 2d Public Officers and Employees § 2 (1997). Private rights — "the liability of one individual to another under the law" — are simply not at issue in an Ethics Commission proceeding.Granfinanciera, 492 U.S. at 51 n. 8. *Page 25 
The Court is not persuaded by Irons' argument that the Ethics Commission's investigation of him was transformed into a private action because it was initiated by private individuals. (Irons' Mem. of Law at 20) While it is true that the Court in National Velour took "no position on whether rights enforced under a state environmental-regulatory scheme that are brought by private parties may be considered public rights," this is not such a case. National Velour, 637 A.2d at 379 n. 5. Although § 36-14-12(b) provides that "[a]ny person, including any member of the commission, may file with the commission a complaint alleging a violation of this chapter," the State of Rhode Island is the real party in interest and the private individuals who initiated the complaint have no participatory role. Section § 36-14-12(b); Commission Regulation 36-14-1001(d). As clearly stated in the Ethics Commission Regulations,
 "Any person or entity which files such Complaint is not a party in interest to any action taken by the Commission. The people of the State of Rhode Island and the Respondent shall be the parties in interest. Notice by a Complainant that he or she wishes to withdraw a Complaint shall in no way affect the continuing jurisdiction of the Commission over the Complaint." Commission Regulation 36-14-1001(d) (emphasis added).
Significantly, the Ethics Commission is not empowered to award compensatory damages to a complainant who may have been impacted by an Ethics Code violation. See § 36-14-13(d); Commission Regulation 36-14-1020. Indeed, the civil remedies available to the Ethics Commission are mainly equitable in nature. Id. The Ethics Commission is empowered to
 "(a) require such violator to cease and desist such violation of the provisions of the Code of Ethics; and/or
 (b) require such violator to file any report, statement, or other information as required by the Code of Ethics; and/or
 (c) require such violator to pay a civil penalty of not more than twenty-five thousand dollars ($ 25,000.00) for each such violation of the Code of Ethics and the pecuniary value of any unjust enrichment realized by the violator as the result of his or her violation of the Code of Ethics; and/or
 (d) remove such violator from office who is not subject to *Page 26 
impeachment . . .
 (e) refer the entire record of its proceedings to the Attorney General, or any appropriate law enforcement agency. Such referral shall not affect any continuing jurisdiction of the Commission over the matter." Section 36-14-13(d).
As such, Ethics Commission proceedings are clearly distinguishable from the situation presented in FUD's Inc. v. State, rendering Irons' reliance on that case unavailing. Unlike here, where any civil penalty assessed by the Commission is paid to the state, the Court inFUD's was faced with a "hybrid cause of action," where a substantial portion of the relief available under the Fair Employment Practices Act (FEPA) was in the form of compensatory and punitive damages paid by one private party to another. FUD's, 727 A.2d at 698.
Lastly, the Court addresses Irons' contention that Ethics Commission proceedings fall outside the public rights doctrine because "the conduct proscribed in the Code of Ethics with which Irons is charged does not constitute the adjudication of a new statutory public right." (Irons' Mem. of Law at 20) (emphasis in original). Specifically, Irons charges that "prohibitions against conflicts of interest or other misconduct by public officials were charges that existed at common law prior to the adoption of the Rhode Island Constitution." Id. Irons does not cite to any Rhode Island cases to support his position, and the Court's review of Rhode Island judicial history has failed to identify any cases prior to the adoption of our state's first Constitution in which allegations of conflict of interest or improper use of position by an elected official required consideration of the right to trial by jury. Moreover, if finding analogous causes of action that may have existed at common law during the 19th Century were the sole consideration, the entire system of administrative law would be disrupted. This is because "[v]irtually all powers to resolve disputes now exercised by administrative agencies have independent common law antecedents previously enforced by courts." Richard J. Pierce, Jr.,Administrative Law *Page 27 Treatise, § 2.8 at 119 (4th ed. 2002). Even environmental regulation, for example, an area commonly adjudicated by administrative agencies, has "clear historical antecedents in the common law action for nuisance." Id. Yet it is it well-settled under Rhode Island law that there is no right to a jury trial where the Department of Environmental Management imposes an administrative penalty. See National Velour,637 A.2d at 376-77. In fact, many of these "preexisting judicially administered private rights [were] replaced by an agency-administered regulatory system because the prior system of common law rights simply did not work satisfactorily." Pierce, Jr., Administrative LawTreatise, § 2.8 at 119.
The Ethics Commission's adjudication of Code of Ethics violations by public officers and employees is itself a new statutory right unknown at common law. See § 36-14-13 (titled "Adjudicative powers of the commission"). It was not until 1986 that the Rhode Island Constitution was amended to include an Ethics Amendment, creating the Ethics Commission empowered to adopt, adjudicate, and enforce a Code of Ethics. R.I. Const. Art. 3, sec. 8. This system of adjudicating ethics violations at the agency level would bear little or no resemble to the private rights that may have existed at common law. The Supreme Judicial Court of Massachusetts concluded the same in Zora v. State EthicsCommission, 415 Mass. 640, 652-53 (1993), when it held that "[p]roceedings to adjudicate civil violations of [conflict of interest laws] are essentially sui generis and do not express a civil claim, right, or remedy which was recognized at common law as requiring a jury trial."
The Court concludes that Ethics Commission proceedings do not implicate private rights, but rather involve the adjudication of exclusively public rights, and therefore, Irons' right to a jury trial under article I, section 15 of the Rhode Island Constitution has not been violated. *Page 28 
 Conclusion
The Court concludes that past legislative acts performed by Irons are prohibited from inquiry by the Speech in Debate Clause. Consequently, the Ethics Commission is constitutionally precluded from questioning Irons about those acts. Accordingly, Irons' motion to dismiss is granted. The Court also determines that Irons would not be entitled to a jury trial before the Ethics Commission were he not provided immunity by the Speech in Debate Clause. Counsel shall submit an order consistent with this opinion.
[1] Though the Ethics Commission has not issued a final determination of the allegations against Irons, the Court notes that this matter is properly before the Superior Court pursuant to § 42-35-15(a), which provides, in relevant part: "Any preliminary, procedural, or intermediate agency act or ruling is immediately reviewable in any case in which review of the final agency order would not provide an adequate remedy." Because Irons contends that the Ethics Commission lacks authority to question him about these allegations because of a deeply rooted constitutional privilege afforded to legislators, the Court concludes that final review of this matter by the Ethics Commission would be inefficient and needlessly waste the parties' resources.
[2] The Rhode Island Supreme Court has determined that "the plain and ordinary meaning of the term `adopt' as set forth in article 3, section 8, clearly indicates an intent by the framers to confer upon the [Ethics] commission the power to enact substantive ethics laws." In reAdvisory Opinion to the Governor (Ethics Commission), 612 A.2d 1, 3
(R.I. 1992). The Commission, however, is nonetheless bound by the Constitution and subject to judicial review. Id. at 14, 15.
[3] Rhode Island's Speech in Debate Clause is substantially similar to the United States Constitution's Speech or Debate Clause, which provides in relevant part: "The Senators and Representatives . . . for any speech or debate in either House, they shall not be questioned in any other place." U.S. Const. art. 1, sec. 6. The Rhode Island Supreme Court has rejected the contention that there is any relevant difference between the federal and state provisions. Holmes, 475 A.2d at 981. For the purposes of this decision, the Court generally uses the term "Speech in Debate" when referring to the Rhode Island provision and "Speech or Debate" when referring to the federal provision; however, when discussing the privilege generally, the terms may be used interchangeably.
[4] As of 2003, forty-three state constitutions contained a privilege for state legislators analogous to the Speech or Debate Clause found in the Federal Constitution. See Steven F. Huefner, The Neglected Value ofthe Legislative Privilege in State Legislatures, 45 Wm. Mary l. Rev. 221, 224 (2003).
[5] Though this quotation references the construction of statutes, Justice Suttell's opinion makes clear that he would apply the same analysis to constitutional provisions. McKenna, 874 A.2d at 241. Indeed, Justice Suttell began his discussion of constitutional construction by referencing "rule[s] of statutory, or constitutional, construction. . . ." Id.
[6] The Court is aware that the Rhode Island Supreme Court affirmed this rule of statutory construction in its most recent term. Such v.State, 950 A.2d 1150, 1156 (R.I. 2008). However, this Court relies upon Justice Suttell's opinion in McKenna because that case involved the construction of constitutional provisions instead of the statutory provisions considered in Such.
[7] The Court has also reviewed the transcript of the Constitutional Convention Committee on Ethics and finds no mention whatsoever of the Speech in Debate Clause, nor any evidence that the drafters intended for the Speech in Debate Clause not to apply in proceedings before the Ethics Commission.
[8] The Court notes that in addition to voting to adopt an Ethics Amendment in 1986, the people "also voted to reaffirm the existing provisions of the Rhode Island Constitution," including the Speech in Debate Clause. In re Advisory Opinion, 612 A.2d at 3.
[9] The United States Supreme Court has defined a "private right" as "`the liability of one individual to another under the law as defined,' in contrast to cases that `arise between the Government and persons subject to its authority in connection with the performance of their constitutional functions of the executive or legislative departments.'"Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 51 n. 8 (1989) (quotingCrowell v. Benson, 285 U.S. 22, 50-51 (1932)) (internal citations omitted).